COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                    SUPREME JUDICIAL COURT
                                               FOR SUFFOLK COUNTY
                                               NO: BD-2026-044

IN RE: MARK RAYMOND JOUBERT.

<u>MEMORANDUM OF DECISION</u>

This matter came before the court on an information and record of proceedings filed by the Board of Bar Overseers (board) pursuant to S.J.C. Rule 4:01, § 8 (6), as appearing in 453 Mass. 1310 (2009).  The board recommended that the respondent, Mark Raymond Joubert, be indefinitely suspended from the practice of law for professional misconduct related to, inter alia, a business transaction with a client pursuant to which the client unwittingly awarded the respondent a fifty percent ownership interest in the client's property and the respondent's failure to disclose this ownership interest to the client; three board members dissented solely on the recommended sanction, recommending that the respondent be disbarred in view of the egregious nature of his misconduct as well as his lack of remorse and candor.

The court has reviewed the record and pertinent papers in this case, including, inter alia, the report of the Hearing Committee (committee), the decision of the board, and the parties' briefing on appeal to the board.  The court has also

heard and considered arguments made by the Office of Bar Counsel (bar counsel) at a hearing before it.  Although properly being served with notice of the hearing, neither counsel for the respondent nor the respondent appeared; nevertheless, the court allowed the respondent ten business days to submit any arguments he wished the court to consider in writing.  The respondent did so and explained the failure to appear was caused by an inadvertent, excusable error related to a misunderstanding as to the time of the hearing.  The court has considered the respondent's post-hearing submission and takes no adverse inference from the respondent's absence at the hearing.  For the reasons set forth below, it is ordered that the respondent's license to practice law in the Commonwealth be, and the same hereby is, indefinitely suspended.

1.  Background.  a.  Facts.  The following is a summary of the relevant factual findings of the committee, as adopted by the board.  Matter of Williams, 491 Mass. 1021, 1022 (2023).  The respondent worked at a parcel delivery company in the 1980s.  While there, the respondent met and befriended the client, who was significantly older than the respondent and a steward of their employment union.  The two men lost touch at some point; during this period, the respondent obtained undergraduate and graduate degrees, including a juris doctorate.  The respondent became a member of the Massachusetts

Bar in 2002.

By 2009, the respondent was in serious financial and personal distress.  He had lost his home and law office to foreclosure and was finalizing his second divorce.  Seeking funds, the respondent went to his old union hall to liquidate an account; there, he left his contact information with the employees and asked that they pass it along to the client, who had since retired.  The client eventually received the information and contacted the respondent to schedule a meeting.

During their meeting, the respondent confided in the client, disclosing his difficult personal and financial circumstances, including his housing instability.  The client, who owned a six-unit apartment building in Worcester (Blackstone property), offered to allow the respondent to live rent-free in one of the recently vacated apartments.[1]  The respondent accepted the offer, because, in his words, "[i]t was there or [his] car."  The respondent stayed at the apartment, which doubled as his law office, for approximately three and a half years; during this period, the respondent did not pay rent or cover the costs for utilities.

---

[1] The respondent testified that he told the client, "I have nothing.  I have no money, and [the client] said [']that's okay. You can get back on your feet here.  I will let you stay here for nothing and it won't cost you anything.  We will see what happens.[']"

Shortly after the respondent moved into the Blackstone property, he began to act as the client's lawyer.  He represented the client in a legal matter, writing a letter to demand return of a deposit the client had made in connection with a property auction; sometime later, the respondent handled a second legal matter for the client, helping resolve a parking issue with the city.  The respondent did not charge the client for this work.  When introducing the respondent to friends, the client would refer to him as his "lawyer," and in 2011 the client loaned $4,000 to the respondent, indicating on the memo line of the check that the money was a "short-term attorney loan."

In or around October 2010, the client told the respondent that he was interested in developing a ninety-two acre property he owned in Leicester (Leicester property) as a source of alternative energy.  The respondent assisted the client in applying for a federal grant to perform a feasibility study for a possible wind power project; because the grant required the property to be held by a corporation, the respondent drafted a deed, which the client signed in October 2010, transferring ownership of the Leicester property from the client, individually, to a corporation named "Springer, Inc."  At the time the deed was signed and later recorded in June 2011, "Springer, Inc." did not exist.

The client subsequently altered his plans from developing a wind farm to developing a solar energy farm; the respondent continued to counsel the client that it was best to transfer the Leicester property to a corporation.  The client heeded the respondent's advice, and the respondent drafted Articles of Organization (articles) to form "Springer Hill 1154, Inc." (Springer Hill); the client signed the incorporation papers in July 2011.  The articles named two principals -- the client as president, treasurer, and director, and the respondent as secretary, registered agent, and director -- and granted them equal numbers of the corporation's 10,000 shares.  The respondent provided no consideration for the fifty percent ownership stake set forth in the articles.

The client signed the articles with the understanding that they made him the sole owner of Springer Hill.  Indeed, the respondent understood that the client believed he was the sole owner because the client told the respondent he intended to pass full ownership of the Leicester property to his children. The respondent never corrected the client's understanding by disclosing that, pursuant to the articles, the client would be relinquishing fifty percent of his ownership stake in the Leicester property to the respondent.  The respondent never obtained a written conflict of interest waiver from the client even though he had drafted the articles on the client's behalf

and pursuant to the articles had been given an ownership interest in the newly formed corporation.  The respondent also failed to advise the client to seek the advice of independent counsel before signing either the deed or articles.

A few days after the client signed the articles, the respondent filed an affidavit of scrivener's error to "correct" the corporation's name in the deed from "Springer, Inc." to "Springer Hill 1154, Inc." -- a corporation that had only recently been formed and had not existed when the original deed was signed and recorded.  The respondent averred that he was an attorney even though his license to practice law was suspended at the time and indicated that his office was located at the Blackstone property.  The affidavit also misstated the date on which the client signed the deed.

Sometime in the summer of 2011, the client entered into two option lease agreements with a company to develop a solar energy project on the Leicester property; both the client and the respondent signed the agreements.  In June 2012, the client, dissatisfied with the lack of progress on the solar energy project, directed the respondent to terminate the option lease agreements.  The respondent drafted a termination letter in which he referred to himself as the client's "partner," a characterization to which the client objected; the client instructed the respondent to remove the term "partner," but the

respondent ignored the instruction and included the title in the final letter.

The same month that the respondent sent the termination letter, the client, with the help of his girlfriend, voluntarily dissolved Springer Hill.  Soon thereafter, a lawyer for the respondent sent a letter to the client asserting that the respondent and the client were equal shareholders of Springer Hill; that the client had fraudulently dissolved it; and that the respondent was entitled to half of the corporation's assets. Following receipt of the letter, the client asked the respondent to vacate the apartment at the Blackstone property; the respondent pleaded to stay, promising to pay rent if he was allowed to remain for three more months.  The client relented. When the respondent neither paid the promised rent nor left the apartment, the client initiated eviction proceedings, which ended in an agreement by the respondent to vacate the premises on or before December 15, 2012.

In June 2014, the respondent filed a civil action in the Hampden County Superior Court against the client and Springer Hill seeking damages for, inter alia, breach of contract and breach of fiduciary duty on the grounds that he was owed compensation for his work on the solar energy project and was the half owner of Springer Hill.  The client counterclaimed for fraud, misrepresentation, breach of fiduciary duty, malpractice,

and negligence.  Following a jury waived trial, the Superior Court judge ruled in favor of the client on all counts.  Joubert vs. Miley et. al., Docket No. 1485-cv-01074 (Worcester Sup. Ct., Jan. 26, 2018).[2]  The Appeals Court reversed the judgment in the client's favor on most of the counterclaims, concluding that he had failed to demonstrate damages, but affirmed the judgment on the counterclaim for repayment of the $4,000 loan.[3]  Joubert v. Miley et. al., 99 Mass. App. Ct. 1128 (June 8, 2021) (unpublished opinion).

For failing to inform the client that the deed and articles that he signed granted the respondent a fifty percent ownership stake in the corporation and hence in the Leicester property, the committee determined that the respondent violated Mass. R. Prof. C. 1.4 (communication with client), 8.4 (c) (conduct involving dishonesty, fraud, deceit, or misrepresentation), and

---

[2] The client passed away from cancer several months later in November 2018.

[3] After the full court denied further appellate review, the respondent sought a writ of certiorari from the United States Supreme Court, which was denied.  See Joubert v. Miley, 448 Mass. 1102 (2021), cert. denied, 142 S. Ct. 2710 (2022).  In October 2022, the respondent filed a civil action in the United States District Court for the District of Massachusetts against the Chief Justice of this court and the Superior Court, the three Appeals Court justices that ruled against him in his civil action against the client, and the General Counsel of the board, alleging that they defamed him and violated his constitutional right to pursue the employment of his choosing.  See Joubert v. Green et al., Docket No. 4:22-cv-40111 (D. Mass. Oct. 6, 2022).

8.4 (h) (other conduct reflecting adversely on fitness to practice).  The committee concluded that the respondent not only failed to disclose or explain the legal implications of the deed and articles to the client, but that he did so purposefully to trick the client into making him a partner in the corporation, thereby defrauding the client of half of his property.

The committee further determined that by drafting the articles in a way that granted him a fifty percent ownership stake in the corporation and hence in the Leicester property, the respondent entered into a business transaction with the client, and that the respondent violated Mass. R. Prof. C. 1.8 (a) (conflict of interest)[4] and 8.4 (h) by entering into such a business transaction where the terms of the transaction were not

---

[4] Mass. R. Prof. C. 1.8 (a) states:

"A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction."

fair and reasonable to the client; where the terms of the transaction were not transmitted to the client in a writing he reasonably could understand and were not agreed to in writing by him; and where the respondent did not give the client a reasonable opportunity to seek the advice of independent counsel in the transaction.

The committee found no factors in mitigation of the respondent's misconduct, nor were any proposed.  In aggravation, the committee found that the respondent (i) had been disciplined previously for deceptiveness in a similar scheme for personal financial gain involving people close to him;[5] (ii) took advantage of an elderly and unsophisticated client; (iii) was driven by selfish motives for personal financial gain; (iv) lacked candor at the hearing before the committee; (v) failed to acknowledge his misconduct while continuing to blame others; and (vi) violated multiple disciplinary rules.

The board adopted the committee's legal conclusions that the respondent violated Mass. R. Prof. C. 1.4, 1.8 (a), 8.4 (c), and 8.4 (h).  In so doing, the board rejected the respondent's

---

[5] As explained in greater detail infra, the respondent previously received a three month suspension for violations of Mass. R. Prof. C. 1.2 (a), 1.4 (a), 1.4 (b), 1.7 (b), and 8.4 (h), in connection with his application for mortgage financing for his personal home in his then in-laws' names without informing them that they were listed as the sole borrowers on the promissory note.

defense that he did not believe that he had been acting as the client's lawyer in connection with the solar energy project, concluding that the committee's finding to the contrary was supported by the evidence of record independent of the issue preclusion order.  See discussion infra.  The board further rejected the respondent's claim that he had no intention of defrauding the client in connection with the project.  The board, in adopting the committee's findings, rejected the respondent's contention that he did not recall recording the deed at the registry of deeds; that he was a passive scrivener of the articles on the client's behalf; and that he believed the client had a second attorney who ultimately would review the documents.  Further, the board agreed with the committee's conclusion that the respondent's previous bar discipline, selfish motives, lack of candor, and failure to acknowledge his misconduct constituted aggravating factors; however, the board rejected as inapplicable two factors that the committee had found in aggravation -- namely, that the client was elderly and unsophisticated, and that the respondent had violated multiple disciplinary rules.

    b.  Procedural history.  Bar counsel filed a single count petition for discipline on July 26, 2018.  Prior to the hearing, bar counsel filed a motion for issue preclusion based on the factual determinations set forth in the Superior Court decision,

as affirmed by the Appeals Court, in the related civil action discussed supra; the board chair allowed the motion in part, holding that the determination in the civil action that the respondent had acted as the client's attorney in connection with the solar energy project and the formation of Springer Hill was binding in the bar discipline matter.  Following a two-day hearing in August 2024, during which four witnesses testified (including the respondent),[6] the committee issued its hearing report recommending that the respondent be suspended indefinitely from the practice of law.  The public member dissented, recommending instead that the respondent be disbarred.  On appeal, the board recommended an indefinite license suspension; three members dissented, recommending that the respondent be disbarred.

On appeal here, the respondent, as he did before the board, principally challenges the portion of the issue preclusion order prohibiting him from contesting that he acted as the client's lawyer in connection with the solar energy project and the formation of Springer Hill.  The respondent also contends that the proposed indefinite suspension recommended by bar counsel

---

[6] Because the client had died prior to the disciplinary hearing, the transcripts from his Superior Court testimony in the related civil action were admitted as exhibits.  See Joubert vs. Miley et. al., Docket No. 1485-cv-01074 (Worcester Sup. Ct., Jan. 26, 2018).

and the board is too severe.  In his appeal to the board, the respondent made additional arguments, contesting the committee's findings that (1) the respondent intentionally defrauded the client into signing the articles to confer upon himself a fifty percent ownership interest in the corporation, (2) the client was elderly and unsophisticated for purposes of aggravation, and (3) other aggravating factors applied.

2.  Discussion.  a.  Standard of review.  This court will uphold "[t]he subsidiary findings of the hearing committee, as adopted by the board, . . . 'if [they are] supported by substantial evidence.'"  Matter of Weiss, 474 Mass. 1001, 1001 n.1 (2016), quoting S.J.C. Rule 4:01, § 18 (5), as appearing in 453 Mass. 1315 (2009).  See Matter of Abbott, 437 Mass. 384, 393-394 (2002), and cases cited.  "[T]he . . . committee's ultimate 'findings and recommendations, as adopted by the board, are entitled to deference, although they are not binding on this court.'"  Weiss, supra, quoting Matter of Ellis, 457 Mass. 413, 415 (2010).  See Matter of Lupo, 447 Mass. 345, 356 (2006).  The committee, however, is the sole judge of credibility.  Matter of Zankowski, 487 Mass. 140, 144 (2021).  Accordingly, its "credibility determinations will not be rejected unless it can be said with certainty that the finding was wholly inconsistent with another implicit finding" (quotation and citation omitted).  Matter of Haese, 468 Mass. 1002, 1007 (2014).

b.  Issue preclusion order.  The respondent contends that the issue preclusion order prejudiced him.  Specifically, he asserts that by preventing him from contesting that he acted as the client's attorney in connection with the solar energy project and the formation of Springer Hill, the order essentially dictated a finding that he violated Mass. R. Prof. C. 1.8 (a).  See note 4, supra.

Even if the respondent's argument had merit, but see Matter of Brauer, 452 Mass. 56, 66 (2008), quoting Bar Counsel v. Board of Bar Overseers, 420 Mass. 6, 11 (1995) (noting that "offensive use of collateral estoppel is appropriate in bar disciplinary proceedings"), the committee's findings, independent of the issue preclusion order, amply establish that the respondent was acting as the client's attorney for several years and across several matters, including importantly in connection with the solar energy project and the formation of Springer Hill.  The committee's findings, which find substantial support in the record,[7] include that the respondent represented the client in at least two distinct legal matters before advising the client

---

[7] The respondent asserts that the committee's factual findings cannot be viewed independently of the preclusion order. However, the committee specifically cited to the relevant hearing transcripts and exhibits supporting its findings.  In short, these findings, separate and apart from the issue preclusion order, support the conclusion that the respondent acted as the client's lawyer.

regarding the wind farm and eventually the solar energy project; that the client introduced the respondent to others as his "lawyer"; that the client wrote the respondent a check which stated "short term attorney loan" in the memo line; that the respondent drafted and recorded the deed to transfer ownership of the Leicester property to a corporation; that the respondent drafted the articles to create Springer Hill; and that the respondent drafted and filed an affidavit of scrivener's error for the deed wherein he identified himself as a lawyer.  Thus, regardless of whether the issue preclusion order was proper, the committee's findings independently support the determination that the respondent was acting as the client's lawyer.

c.  Rule violations.  The board affirmed the committee's findings that the respondent's conduct violated Mass. R. Prof. C. 1.4, 1.8 (a), 8.4 (c), and 8.4 (h), and the court concurs with the board.  See Weiss, 474 Mass. at 1001 n.1.  Under rule 1.4, the respondent had a duty to explain the matter "to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."  By preparing the articles granting himself a fifty percent ownership interest in the corporation and thus in the Leicester property for no consideration, and presenting the articles to the client for signature without explaining the material terms transferring ownership from the client to the respondent, the respondent

failed to reasonably inform the client about the implications of signing the articles such that he could make an informed decision.  See Matter of Mullen, 26 Mass. Att'y Disc. R. 378, 383 (2010) (finding Rule 1.4 violation where respondent, inter alia, advised client to convert her assets to annuities sold by insurance company for which respondent was agent, did not inform client of his financial interest in transaction, and did not investigate whether client would incur charges from selling assets or explore other strategies).

The committee's findings also support the conclusion that the respondent violated rule 1.8 (a), which prohibits a lawyer from entering into a business transaction with a client that grants the lawyer a pecuniary interest adverse to the client unless "(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client, (2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and (3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction."  The respondent entered into a business transaction with the client in which he obtained a pecuniary interest in the newly formed

corporation and thus in the Leicester property.  The terms of the transaction were not fair and reasonable to the client as the respondent did not provide consideration for the ownership interest.  And the respondent did not disclose the terms of the transaction in writing in a manner that the client could understand, did not advise the client to seek the advice of independent counsel before signing the papers, and did not obtain informed consent in writing from the client.  See Mullen, 26 Mass. Att'y Disc. at 383 (attorney violated rule 1.8 where he advised client to convert assets into annuities sold by insurance company for which he was agent and never disclosed terms of transaction to client in writing, never obtained client's written consent to inherent conflict in earning commission from insurance company based on transaction, and never offered client reasonable opportunity to seek advice of independent counsel).

The same corpus of facts equally supports a finding that the respondent violated rules 8.4 (c) and (h).  For his part, the respondent contends that the factual finding underlying the violation of subsection (c) -- that the respondent intentionally defrauded the client into signing the articles to confer on the respondent a fifty percent ownership interest in the corporation -- is not supported by substantial evidence.  However, by his own admission, the respondent did not tell the client that he

prepared the papers so as to make himself a principal with equal shares in the corporation; did not provide consideration for the fifty percent ownership interest; did not ask the client to consent to the conflict of interest inherent in the transaction; and did not advise the client that the client could -- and indeed should -- seek the advice of independent counsel. In fact, the respondent admitted that he did not believe he had a valid claim of ownership under the articles but rather hoped to use the incorporation papers as "leverage" to secure some sort of financial benefit from the client at a later date.

d. Aggravating factors. The board affirmed the committee's findings that the respondent's prior bar discipline, selfish motives, lack of candor at the disciplinary hearing, and failure to take responsibility for his actions, all constituted aggravating factors; however, the board rejected the committee's recommendation that it consider in aggravation that the respondent violated numerous rules of professional conduct and that the client was elderly and vulnerable. For the reasons stated below, the court concurs with the board.

As an initial matter, the respondent's prior misconduct is similar to that in the case at bar and thus was appropriately considered in aggravation. In the prior matter, the respondent violated, inter alia, Mass. R. Prof. C. 1.4 (a) and (b), and 8.4

(h).[8]  The violations stemmed from his application for a mortgage loan for his personal home in his then in-laws' names without consulting them about the terms of the mortgage or providing them with a copy of the promissory note.  The respondent's in-laws only learned that they were the sole named borrowers on the note when the respondent stopped making mortgage payments and their credit cards were cancelled.  When the respondent's in-laws confronted the respondent, he refused to pay rent or vacate the property, forcing them to serve him with a notice to quit.  The key features of this prior conduct -- deceit of trusted persons to obtain financial gain and refusal to assume responsibility when confronted -- are equally present in this matter.  See Matter of Ryan, 24 Mass. Att'y Disc. R. 632, 641 (2008) ("A disciplinary history of similar violations is an especially weighty aggravating factor").

The respondent does not challenge the committee's finding that he operated from selfish motives but disputes the findings that he lacked candor at the disciplinary hearing and that he failed to take responsibility for his actions.  The respondent's challenge to these findings rests on determinations of

---

[8] The committee erroneously stated in its findings that the respondent was found to have also violated Mass. R. Prof. C. 8.4 (c).  The respondent, however, suffered no prejudice from this misstatement; contrary to the respondent's contentions before the board, the facts underlying that disciplinary action amply establish that he knowingly deceived his then in-laws.

credibility, as to which the court must defer to the committee, which found that the respondent's testimony was "intentionally" and "knowingly" false in several respects.[9]  See Matter of Dasent, 446 Mass. 1010, 1012 (2006), quoting Matter of Saab, 406 Mass. 315, 328 (1989) ("[t]he fact that the [] committee 'accorded weight to the [] testimony of the complainant[] rather than accept[] the respondent's explanations for what had occurred,' . . . does not render the evidence supporting the committee's findings 'not substantial'").

The board's assessment that the evidence at the hearing did not support the committee's finding that the client was "vulnerable" as that term is defined in our case law is well supported.  See Matter of Ruggiero, 39 Mass. Att'y Disc. R. 1, *22 n.24 (2023) ("A client is 'vulnerable' when the client [i] has limited education, [ii] has limited or no ability to speak English, [iii] is elderly, [iv] is unsophisticated, or [v] is

---

[9] The committee found that the respondent testified falsely repeatedly.  For example, the committee found that the respondent testified falsely that he did not recall recording the deed, that he was a passive scrivener of the articles, that he believed the client had a second lawyer who would review the articles, and that the decision to assert his purported interest in the corporation was not his but that of his lawyer.  As the board acknowledged, the committee was best positioned to observe the respondent and make determinations as to his credibility.  To be sure, the respondent was entitled to marshal a defense; however, as the board noted, there is a material difference between defending against allegations and bad faith testimony that is patently incredible.

dealing with a calamitous personal situation").  While the client was seventy-two years old at the time he signed the deed, the record does not suggest any mental infirmity or other disability.  Compare Matter of Tracia, 31 Mass. Att'y Disc. R. 640, 648-649 (2015) (age relevant to vulnerability determination where attorney took financial advantage of seventy-five year old client-father, after client suffered "a series of strokes," and treating physician opined that client "lacked the capacity to make or to communicate health care decisions"); Matter of Hayes, 493 Mass. 1010, 1015 (2023) (vulnerability established where attorney "prey[ed] on his client's lack of education, mental health issues, and the stress induced by the . . . proceedings" to have client sign "'predatory' fee agreement and durable power of attorney").  Nor is it apparent from the record that the client was "unsophisticated" for purposes of aggravation.  Indeed, the client owned and managed multiple properties, had risen to the leadership role of union steward at his former job, and generally was able to look after his own affairs and interests.  Compare Lupo, 447 Mass. at 357 (vulnerability established where, at time of disputed transaction, attorney's client-aunt "was elderly, and dependent on [attorney] as her only caregiver").

The board's rejection of the committee's determination that the respondent's violation of numerous rules of professional

conduct constituted an aggravating factor is also well supported. All the violations stemmed from a single course of conduct -- the formation of a company in which the respondent surreptitiously gave himself a fifty percent ownership interest and the related transfer of the client's real estate to that corporation. See Saab, 406 Mass. at 326 (in deciding sanction, "the simultaneous consideration of separate violations . . . is an established part of the disciplinary system of this Commonwealth" [emphasis added]). Contrast Hayes, 493 Mass. at 1010-1011, 1016 (finding fact of multiple rule violations in aggravation where violations predicated on numerous distinct acts, including setting up trust accounts that violated orders of probate court, making intentional misrepresentations about client's assets in court proceedings, filing frivolous bankruptcy petition for purpose of staying enforcement of court orders, and directing client to sign predatory fee agreement and durable power of attorney).

e. Sanction. This court must decide each case "on its own merits," affording "every offending attorney . . . the disposition most appropriate in the circumstances," Matter of Foster, 492 Mass. 724, 746 (2023), quoting Matter of Murray, 455 Mass. 872, 883 (2010), guided by the precept that "[t]he appropriate level of discipline is that which is necessary to deter other attorneys and to protect the public." Matter of

Zak, 476 Mass. 1034, 1038 (2017), quoting Matter of Curry, 450 Mass. 503, 530 (2008). See, e.g., Matter of Foley, 439 Mass. 324, 333 (2003) (sanctions must not be "markedly disparate from judgments in comparable cases" [quotation and citation omitted]). The most important consideration in attorney discipline cases is "the effect upon, and perception of, the public and the bar." Matter of Finneran, 455 Mass. 722, 737 (2010), quoting Matter of Finnerty, 418 Mass. 821, 829 (1994). The board's recommendation on the appropriate sanction is given "substantial deference." Matter of Gannett, 489 Mass. 1007, 1011 (2022).

Where, as here, a business transaction involves "self-dealing . . . or egregious conflicts causing substantial injury to clients," the appropriate sanction generally is a suspension. Matter of Carnahan, 449 Mass. 1003, 1005 (2007). The length of the suspension depends on a variety of factors, including whether the respondent has engaged in a pattern of self-dealing, the extent of the harm to the client, whether the respondent acted with predatory intent, and the presence or absence of any mitigating or aggravating factors. See Matter of Weisman, 30 Mass. Att'y Disc. R. 440, 443 (2014) (one year suspension for dishonesty in representation of single client over several years during which monthly retainers were used to keep attorney's law firm financially afloat regardless of work performed); Mullen,

26 Mass. Att'y Disc. R. at 382-384 (stipulated six month suspension for attorney, who was also agent for life insurance company, who recommended that his client buy Medicaid-compliant annuities from him without disclosing commission benefits; misconduct mitigated by lack of harm, as attorney reversed transaction and returned commission); Lupo, 447 Mass. at 358-359 (indefinite suspension for two incidents of self-dealing for financial gain involving vulnerable clients).

Having reviewed the cases cited by the parties for purposes of calibrating the appropriate sanction here, the court agrees with the board that Lupo, 447 Mass. at 346-360, while not precisely on all fours with the instant matter, provides the most apt guidance.  In that case, a real estate attorney, who was also a real estate broker, received an indefinite suspension for two schemes to defraud elderly clients.  Id. at 345-346.  In the first scheme, the respondent, acting as both an attorney and broker, deliberately misrepresented the amount of his broker's commission to his clients, six elderly sisters, in order to induce them into signing a listing agreement -- conduct found to violate, inter alia, rules 1.8 (a) and 8.4 (c) and (h).  Id. at 346-349, 352.  In the second, the respondent, acting as his elderly aunt's attorney, knowingly misrepresented the value of his aunt's house in order to purchase it from her at a price far below fair market value; for this conflicted transaction, the

respondent was found to have violated rules 1.8 (a) and 8.4 (c) and (h).  Id. at 349-351, 354.

In determining that an indefinite suspension was the appropriate sanction, the court in Lupo considered multiple factors in aggravation, including that the respondent's conduct was motivated by a selfish desire for financial gain and that the respondent lacked candor at the disciplinary hearing.  Id. at 354.  The court found as particularly egregious the respondent's intentional withholding of information concerning the fair market value of his aunt's property; the court noted that while withholding information for financial gain and intentional deprivation of client funds are distinct wrongs, the presumptive sanction for intentional deprivation of client funds -- disbarment or indefinite suspension -- was appropriate given the "remarkable similarities" between the two offenses.  Id. at 359.

Here, as in Lupo, the respondent engaged in predatory self-dealing by engaging in deception that inured to his financial benefit.  Further, like the attorney in Lupo, the respondent took advantage of someone with whom he had a trusting, almost familial relationship.  See Lupo, supra at 358 ("The obligation of an attorney to those he advises does not terminate because of the existence of a familial or close relationship, or because he is not compensated for his services.  Such a relationship

requires that the attorney exercise the greatest care because the level of trust placed in his advice will likely be all the greater").  Most critically, like in Lupo, the respondent intentionally withheld critical information about the transaction in order to reap a substantial benefit at the client's cost.

Admittedly, unlike in Lupo, here we are dealing with one instance of duplicity (not two) and the client did not ultimately lose his property.  However, the respondent's single conflicted transaction is compounded by the fact that he has already been suspended for similar misconduct involving his in-laws.  Further, the respondent's conduct was made more egregious by his decade-long attempt to use the fraudulently obtained ownership interest to extort money from the client for legal claims that he knew had no merit.[10]  And even though the client did not lose his property, the client did suffer substantial harm in having to defend against the respondent's frivolous and prolonged lawsuit.  Moreover, we have previously found indefinite suspension an appropriate sanction for an attorney who engages in an improper business transaction, even when the transaction is not completed.  See Matter of Doherty, 29 Mass.

---

[10] The respondent's first demand for payment through his attorney was dated July 16, 2012, and his appeal of the lower court's decision to the United States Supreme Court was denied on May 16, 2022.

Att'y Disc. R. 196, 196-197, 202 (2013) (imposing sanction of indefinite suspension even though attorney's misconduct, which involved a conflicted transaction in violation of rule 1.8 [a], did not result in any improper benefit to him because sales were not completed).

The respondent contends that indefinite suspension is too severe, because, inter alia, he maintains he did not violate rule 8.4 (c) by intentionally defrauding the client into effectively relinquishing a fifty percent interest in his property.  As discussed supra, the committee's conclusion that the respondent violated rule 8.4 (c) is well supported.

Moreover, the cases which the respondent cites are distinguishable as they lack the degree of misconduct and remorselessness exhibited by the respondent in defrauding the client -- a friend who had shown him tremendous generosity in his time of need and who placed substantial trust in the respondent not only because the respondent was his lawyer, but also because of their long time, almost familial relationship. See Weisman, 30 Mass. Att'y Disc. R. at 443, 450-451 (attorney received one year suspension for, inter alia, misuse of retainer funds to pay law firm's operational debts); Matter of Moran, 27 Mass. Att'y Disc. R. 612, 612-614 (2011) (attorney received two month suspension for, inter alia, preparing instrument, at client's request, under which attorney received substantial

bequest, and borrowing money from client where terms of loan were not fair and reasonable and not fully disclosed and transmitted in writing to client; attorney engaged in conflicted transaction but no undue influence, overreaching, fraud, or misrepresentation at issue); Matter of Duggan, 22 Mass. Att'y Disc. R. 305, 305-308 (2006) (attorney retained to represent couple facing financial difficulties received six month suspension for, inter alia, purchasing clients' home at foreclosure sale); Matter of Viegas, 20 Mass. Att'y Disc. R. 526, 527-528 (2004) (attorney publicly reprimanded for rule 1.8 [c] violation in connection with preparing instrument wherein attorney received bequest from client; significant mitigating circumstances present); Matter of Field, 20 Mass. Att'y Disc. R. 140, 141-142 (2004) (public reprimand for 1.8 [c] violation in connection with preparing instrument under which wife received bequest, which was ultimately declined; significant mitigation present); Matter of Wise, 433 Mass. 80, 87, 92 (2000) (six month suspension for, inter alia, engaging in conflicted representation as retaliation against another client for refusal to pay fees); Matter of Toner, 16 Mass. Att'y Disc. R. 394, 394-395 (2000) (board accepted parties' stipulation and joint recommendation to administer public reprimand without proceedings before committee to attorney who drafted will under which attorney and his family received substantial bequests;

testator's will ultimately admitted to probate and attorney received no financial benefit).

In arguing for a lighter sanction, the respondent places special emphasis on Zankowski, 487 Mass. at 141, a matter in which an attorney received a two-year suspension for fraudulently overbilling several clients; her misconduct was found to violate rules 1.5 (excessive fees), 8.4 (c), and 8.4 (h).  That case is a poor analogue.  Fraudulent overbilling is distinct from entering into a self-dealing transaction with a client to strip the client of half of his ownership interest in a substantial parcel of land for no consideration; the respondent's misconduct involved far more duplicity and predatory behavior than that at issue in Zankowski.

Considering the facts in their totality, including the duplicitous nature of the respondent's actions in attempting to defraud the client; his decade-long quest to extract financial gain from the client by making meritless legal claims; his similar prior misconduct; his unwillingness to take responsibility for his actions, and his lack of candor, indefinite suspension is warranted.  See Matter of Clooney, 403 Mass. 654, 657-658 (1988) ("This is not a case where an attorney engaged in an isolated course of improper conduct and has recognized the wrongfulness of his actions.  In cases such as this, disciplinary measures are necessary to deter future

misconduct on the part of all members of the bar and to preserve public confidence in the bar").

The dissenting members of the board agreed with the majority's findings and conclusions of law, but disagreed with the sanction, recommending instead that the respondent be disbarred. The dissent argued that disbarment was warranted given the respondent's disciplinary history and fundamental dishonesty. To be sure, the respondent has exhibited a troubling pattern of duplicity and lack of remorse. However, it is not clear to the court that the respondent's misconduct warrants more than the sanction of indefinite suspension. Indeed, the dissent does not cite a case resulting in disbarment of an attorney for similar conduct;[11] instead, as discussed

_____

[11] The dissent cites two cases resulting in disbarment. However, as the dissent acknowledges, the cases are distinguishable in that they involve a myriad of violations in addition to self-dealing. See Zak, 476 Mass. at 1035, 1038-1039 (attorney disbarred based on allegations in seven-count complaint detailing wide-ranging misconduct that preyed on "hundreds of economically, educationally, and linguistically disadvantaged clients [facing home foreclosure and] in strained financial circumstances"; offenses included, inter alia, making false and misleading advertisements about loan modification services, charging and collecting advance fees for loan modification services in violation of federal and state law, charging excessive fees, mishandling specific loan modification matters, sharing fees with nonlawyers, and paying others to recommend attorney's services to prospective clients); Matter of Bailey, 439 Mass. 134, 151-152 (2003) (in reciprocal discipline matter, attorney disbarred for intentionally misappropriating client funds and commingling those funds with personal funds; testifying falsely under oath; violating two federal court orders; sending ex parte communications to judge that revealed

supra, the most analogous case cited to the court resulted in the lesser sanction of indefinite suspension. Accordingly, the court agrees with bar counsel, the committee, and the board that indefinite suspension is appropriate. See Doherty, 29 Mass. Att'y Disc. R. at 197-198, 202 (in reciprocal discipline matter, attorney indefinitely suspended for attempting to purchase annuities for client for which he would earn commission without disclosing financial benefit to client; factors in aggravation included prior suspension, selfish motives, and refusal to acknowledge wrongful nature of conduct); Lupo, 447 Mass. at 359 (attorney who had, inter alia, exhibited pattern of misconduct and intentionally misrepresented value of elderly aunt's home in order to purchase it from her below market value, indefinitely suspended); Matter of Eisenhauer, 426 Mass. 448, 452-453 (1998) (attorney indefinitely suspended where he drafted trust naming himself as trustee with extraordinary powers, took substantial trustee fees, and "engaged in dishonesty, fraud, deceit and misrepresentation" in connection with actions as trustee).

3. Conclusion. An order shall enter forthwith suspending the respondent indefinitely from the practice of law in the Commonwealth.

---

client confidences in attempt to influence ruling on pending motion; and engaging in self-dealing by delaying sale of client's property so that attorney could continue to use estate himself).

By the Court,

/s/ Dalila Argaez Wendlandt
Associate Justice


Dated:  July 14, 2026